**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SCOTT MICHAEL MCWILLIAMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **NO. 15-CV-1588** |
| | ) | |
| **NANCY A. BERRYHILL, Acting** | ) | **Honorable Michael T. Mason** |
| **Commissioner of Social Security**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Claimant Scott McWilliams ("Claimant") brings this motion to reverse the final decision of the Commissioner of Social Security ("Commissioner"), denying Claimant's claim for Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act"). 42 U.S.C. §§ 416(i) and 423(d). The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Claimant asks that the court reverse the decision of the Administrative Law Judge ("ALJ"), and the Commissioner asks that the decision be affirmed. This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons that follow, Claimant's motion [20] is denied.

## I. BACKGROUND

### A. PROCEDURAL HISTORY

Claimant filed for DIB on March 29, 2012 alleging disability beginning on March

---

[1] Nancy A. Berryhill is substituted for her predecessor, Carolyn W. Colvin, pursuant to Federal Rule of Civil Procedure 25(d).

27, 2012. (R. 14.) The Social Security Administration first denied his claim on July 26, 2012, and then again after reconsideration on October 4, 2012. (R. 97-98.) Claimant participated in a hearing before ALJ Patrick Morrison on August 15, 2013. (R. 32.) Claimant, represented by counsel, and Vocational Expert ("VE") David Oswald testified during the hearing. (R. 32-84.) The ALJ issued a decision on October 9, 2013, denying Claimant's claim for benefits. (R. 14-24.) The Appeals Council denied Claimant's request for review on December 23, 2014. (R. 1-3.) The ALJ's opinion became the final decision of the Commissioner. 20 C.F.R. § 416.1481; *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Claimant subsequently filed this action in the District Court.

### B. Medical Evidence

As of his alleged onset date of March 27, 2012, Claimant alleges disability due to degenerative disc disease ("DDD"), slipped and protruding disc, cervical radiculopathy, bipolar disorder, and general anxiety disorder. (R. 175.)

#### 1. Treating Physicians

##### i. Physical Health Treatment

Dr. Patti Peterson of Dickinson Neurology Associates first saw Claimant after he tripped while working on a loading dock and struck his right hip and shoulder on concrete in November 2005. (R. 221.) Dr. Peterson's initial impression was that Claimant experienced new-onset numbness and weakness of the right upper extremity. (*Id.*) An MRI of his right shoulder revealed "mild degenerative changes in the acromioclavicular joint and mild tendinopathy of the two supraspinatus tendon." (*Id.*)

On September 11, 2006, Dr. Peterson reported that Claimant's cervical radiculopathy was aggravated by his work as a truck driver and suggested changing

pain medications from Ultram to Vicodin.  (R. 225-26.)  Claimant followed up with Dr. Peterson on October 19, 2006.  (R. 227.)  In this examination, Claimant reported increased pain in the shoulder and arm, specifically when driving.  (R. 228.)  Dr. Peterson noted that Claimant was taking his prescribed Vicodin for pain management but was also taking Norco prescribed from an unknown source.  (*Id.*)

Claimant saw Dr. Peterson on April 20, 2007, at which time she documented that he was being followed for right C6-C7 radiculopathy secondary to a disc osteophyte complex at C6-C7.  (R. 222.)  He reported considerable difficulty with his neck, shoulder, and right forearm pain.  (*Id.*)  Dr. Peterson noted that she did not feel that Claimant had "enough qualification for disability for his cervical radiculopathy[,]" but that his bipolar disorder may be another issue.  (*Id.*)

On July 5, 2007, Claimant was treated by Dr. Peterson and reported continued problems with pain at the right wrist that radiated down his arm, but he denied further problems with shoulder pain.  (R. 221, 224.)  Her impressions were:  "1. Right C6-C7 radicularpathy with a negative EMG and a disc osteophyte complex on MRI. […] 2.  Low back pain.  3.  Bipolar disorder followed by Dr. Barber."  (R. 223.)

On April 25, 2011[2], views of Claimant's cervical spine showed, "[m]oderate disc height loss and moderate DDD at C6 - - C7.  Mild DDD throughout the remainder of the cervical spine.  [M]oderate facet degenerative changes at the left side of the C4 - - C5." (R. 288-89.)  Claimant was described as an individual with pain in his neck and limited range of motion, specifically with limitations turning his head to the right.  (R. 289.)

On July 11, 2011, A.P., lateral, and swimmers views of Claimant's thoracic spine showed "[m]ild diffuse DDD" and "[n]o fracture or subluxation."  (R. 288.)  Claimant

[2] The record is silent as to medical evaluations and diagnoses between 2007 and 2011.

received an L5, S1 transforaminal injection to relieve back pain with lumbosacral radiculopathy and also a "right cervical and thoracic trigger point injection right C5-T2" for "myofascial pain" on August 12, 2011.  (R. 281.)  Both injections were performed by Dr. Wenying Niu at Iron Mountain VA Hospital ("VA Hospital").  (R. 282.)  Claimant contacted Dr. Niu on August 17, 2011, and reported that he was doing "great" after the injections.  (R. 284.)

On December 22, 2011, Claimant presented to the VA Hospital complaining of chronic back pain that increased daily during the last several days.  (R. 262.)  He also experienced an on/off stabbing feeling in his lower back.  (R. 264.)  He was already on Vicodin and taking Naproxen with food.  (R. 262.)  Peggy Keuler, NP, documented that they would bump up the titration schedule of Gabapentin and try Flexeril.  (*Id.*)

During a January 23, 2012 check-up at the VA Hospital, Claimant reported feeling well overall.  (R. 256.)  Dr. Sheela Sangoram documented that Claimant had chronic lower back pain.  (*Id.*)  Nurse Keuler informed Claimant that the results of his recent CT scan were, "[l]eft L5 pars defect with grade 1 L5 on S1 anterolisthesis and uncovering of the posterior margin of L5-S1 disc" with "[m]ild disc degenerative changes at other levels."  (R. 255.)  A pain intervention consult was ordered.  (*Id.*)

On March 12, 2012, Claimant received a right C4-T3 and left L4-C7 trigger point injection performed by Dr. Niu to alleviate cervicothoracic pain.  (R. 249.)  Dr. Niu noted that Claimant's chronic lower back pain had improved 80% from his last injections.  (R. 251.)  Claimant reported significantly improved daily function that allowed him to sit for longer than 30 minutes without pain.  (*Id.*)  He described his recurrent midline thoracic pain as a constant two- to-nine out of ten.  (*Id.*)  Standing, walking, or using his right arm

aggravated the pain. (*Id.*) Claimant also described burning pain from his neck to the left shoulder and explained that he did not have time for physical therapy because of work. (*Id.*)

Claimant contacted the VA Hospital on March 13, 2012 to report severe pain in his lower back while working. (R. 248.) He did not want to have to take more time off work for another injection. (*Id.*) The pain was described as a constant ache at two out of ten. (*Id.*) On March 23, 2012, Claimant called the VA Hospital to make an appointment with his primary care doctor "concerning pain and inability to work the way he needs to," and planned to bring in disability paperwork. (R. 355-56.)

On March 26, 2012, Claimant was again treated at the VA Hospital for lower back pain. (R. 243.) Dr. Sangoram documented that Claimant's increased back pain made it difficult to drive his truck, and he wanted to apply for disability. (R. 243-45.) Dr. Sangoram changed Claimant's pain medication from Vicodin to Oxycodone after Claimant reported insufficient pain relief from Vicodin. (R. 245.) It was noted that he did not take his Gabapentin prescription on a regular basis. (*Id.*)

On August 13, 2012, Claimant presented to the VA Hospital's Emergency Department after pulling something in his back while he was moving a pot. (R. 324.) He described an immediate sensation of pain in the low back that radiated down his right leg. (*Id.*) He hoped to receive an epidural injection, but was informed that they did not administer those in the Emergency Department. (*Id.*) On exam, his back appeared unremarkable, but he was palpably tender in the right paraspinous muscles in the lower lumbar region. (R. 326.) The pain was treated with Ibuprofen. (*Id.*) Claimant felt better

and was discharged that same day with instructions to call the pain clinic for further treatment. (R. 326-27.)

On August 17, 2012, Claimant contacted the VA Hospital to make an appointment for a trigger point injection with Dr. Niu. (R. 322.) His pain level was described as a three. (*Id.*) Claimant received another trigger point injection by Dr. Niu on October 17, 2012. (R. 413.) Dr. Niu documented that Claimant had significant relief in his cervicothoracic region until three months ago. (R. 414.) The pain radiated from his neck and upper thoracic to both shoulders and his right upper arm. (*Id.*)

Claimant attended physical therapy on October 22, 2012 for training in the trigger point injection treatment. (R. 412.) His pain was a zero out of ten. (*Id.*) On November 2, 2012, Claimant followed up with Dr. Niu. (R. 405.) Dr. Niu noted that Claimant's current pain level was two out of ten, but that the pain ranged from one- to-eight out of ten over the last couple weeks. (R. 405-06.) Dr. Niu also reported that Claimant "scored 38/100 on the Quebec Back Pain Disability Scale with 0 indicating no functional limitation and 100 indicating complete disability." (R. 406.) At this follow up, Dr. Niu recommended that Claimant continue physical therapy. (*Id.*)

Claimant attended six physical therapy sessions in November 2012. (R. 399-406.) He typically described his pain as a two out of ten, but he explained that the pain fluctuated. (R. 403-05.) Overall, he found that the injections provided good temporary relief and that he was in less pain after his physical therapy sessions. (R. 405-06.) The physical therapist noted on November 23 that Claimant was inconsistent with his home health exercises. (R. 402-03.) On November 30, 2012, Claimant said that he was not able to do his home exercises because of pain in his lower back. (R. 399.)

6

Claimant attended physical therapy on January 8, 2013, and explained that he missed the last few appointments because of stress in his family life. (R. 396.) Claimant reported pain as a result of being unable to do the exercises, and described his pain as a one out of ten at rest. (R. 397.) He did not have any severe episodes of disc pain since starting physical therapy. (*Id.*)

During physical therapy on February 1, 2013, Claimant explained that multiple personal issues prevented him from attending physical therapy the past few weeks. (R. 390.) Claimant had limited performance in his home exercises, and the therapist noted that more consistent performance needed to be seen in order to justify continued therapy. (R. 390-91.) Claimant attended physical therapy on February 8, 2013, and reported significant improvement in his range of motion. (R. 390.) He also reported that he was performing his exercises regularly. (*Id.*) Claimant attended physical therapy on at least four other occasions between February 15 and March 18, 2013. (R. 387-89.) He reported that he was doing better, although he still had some bad days. (R. 389.)

On February 25, 2013, the physical therapist documented that Claimant may be nearing his maximum level in physical therapy. (*Id.*) Claimant attended physical therapy on March 18, 2013, and reported one episode of lower back pain since his last session that occurred while waving flags at a worship service the day before. (R. 387.) The physical therapist noted that Claimant's lower back pain continued to improve and that neck mobility and pain were better, although Claimant still had difficulty bending his head to the left. (R. 387-88.)

### ii. Mental Health Treatment

On September 11, 2006, Dr. Peterson reported that Claimant had voluntarily stopped taking Seroquel and Lexapro, medications prescribed to treat his personality disorder. (R. 225.) Dr. Peterson articulated concern about Claimant's decision, noting that the previous time Claimant stopped taking the medication, he "had a panic attack and ended up in the hospital." (*Id.*) Dr. Peterson documented on April 20, 2007 that Claimant was currently being treated for his bipolar disorder by Dr. Barber at the VA Hospital.[3] (R. 222.) On July 5, 2007, Dr. Peterson noted that that Claimant exhibited signs of a mood disorder, prescribed a mood stabilizer, and planned to refer Claimant to a psychiatrist. (R. 224.)

On October 24, 2011, Claimant refused to complete a phone interview with the VA Hospital for a mental health consult. (R. 264.) On July 1, 2012, Dr. Gregory Patterson saw Claimant at the VA Hospital and documented that Claimant "decided to discontinue treatment before setting formal treatment goals. He stated his belief he is doing well enough with medication and his current resources." (R. 424.) Claimant contacted the VA Hospital for a behavioral health consult on August 13, 2012. (R. 330.)

Dr. Patterson performed an intake interview at the VA Hospital on September 11, 2012.[4] (R. 314.) Claimant's main problem at the time was insomnia, but he reported struggling with anxiety recently. (R. 315.) Dr. Patterson's diagnostic impressions were as follows: Axis I: Anxiety disorder NOS (not otherwise specified), insomnia, depressive disorder NOS (r/o bipolar disorder, largely in remission), history of alcohol dependence; GAF score of 53. (R. 319.) Claimant agreed to reconsider psychiatric medication management and did not request a referral for additional services at that time. (*Id.*) Dr.

---

[3] There are no treatment records for Dr. Barber contained in the records.

[4] Claimant was originally scheduled for an appointment on August 21, 2012, but he forgot about it. (R. 320.)

Patterson reported that Claimant "showed some difficulties with anger and interpersonal relations," but chose to discontinue mental health treatment because he believed that he was "doing well enough with medication and his current resources." (R. 424.)

On September 26, 2012, Claimant was seen by Dr. Patterson for insomnia, mood disorder, and anxiety disorder. (R. 312.) Dr. Patterson opined that Claimant was a low risk level. (R. 313.) Claimant was more interested in treatment through medication than psychotherapy, but he agreed to follow up with Dr. Patterson. (R. 313-14.)

During a September 27, 2012, mental health consult with Kimberly Wallman, DO, at the VA Hospital, Claimant noted sleep and anxiety problems. (R. 309-10.) He informed Dr. Wallman that he last worked with a psychiatrist in 2009, but he had to stop so that he could work. (R. 310.) Additionally, Claimant explained that he had to quit his bipolar medication in order to work as a truck driver. (*Id.*) Dr. Wallman noted that Claimant seemed to have psycho social difficulties. (*Id.*) Claimant's pain score was a six out of ten. (R. 311.) Dr. Wallman reported that Claimant "has not been bipolar in s/s (signs or symptoms) for three years off medications." (*Id.*) Dr. Wallman reserved other mental health diagnoses and documented that Claimant's social stresses were best treated with therapy. (*Id.*) She prescribed him Temazepam for sleep difficulty. (*Id.*)

Claimant cancelled an appointment with Dr. Patterson on October 15, 2012, and stated that he saw no reason for further therapy sessions because he was doing well. (R. 425.) On October 25, 2012, Claimant completed a follow-up psychiatric examination with Dr. Wallman. (R 409.) Dr. Wallman documented that Claimant had insomnia and "worked and did well, no longer can work." (R. 410.) She reserved other mental health diagnoses because Claimant did not meet the criteria. (*Id.*) Dr. Wallman also noted

that Claimant had social stresses that were best treated with therapy.  (*Id.*)  She reported that he did not present with mental health signs and symptoms.  (R. 411.)

Claimant had a follow up consultation with Dr. Wallman on November 29, 2012, and reported that his sleep aide medication was not helping.  (R. 400.)  Dr. Wallman documented that Claimant was off mental health medications effectively without difficulty.  (*Id.*)  She determined that Claimant did not have a mental disorder and did not need specialty services.  (R. 401.)

### 2. Physical Health Agency Consultant

On June 5, 2012, Eric VanderHaagen, D.O., evaluated Claimant's medical records and completed a Disability Determination Explanation.  (R. 85-96.)  Dr. VanderHaagen concluded that Claimant's residual function capacity ("RFC") allowed him to: occasionally lift and/or carry fifty pounds; frequently lift and/or carry twenty-five pounds; stand and/or walk about six hours in an eight-hour day; and push and/or pull in an unlimited capacity other than listed.  (R. 91.)  Claimant had the following postural limitations: frequent climbing ramp/stairs; occasional climbing ladders/ropes/scaffolds; frequent balancing; frequent stooping; frequent kneeling; frequent crouching; and frequent crawling.  (R. 91-92.)  Dr. VanderHaagen concluded that Claimant's postural limitations were secondary to LOM (limitations of motion) and pain complaints.  (R. 92.)  Dr. VanderHaagen based these conclusions on VA Hospital medical records and findings of facts and analysis.  (R. 91.)

### 3. Mental Health Agency Consultants

On July 9, 2012, Drs. Barbara Halazon and Margaret Cappone completed a psychiatric/psychological medical report.  (R. 296-303.)  Claimant discussed his

background with the psychologists and explained that he stopped working on March 26, 2012 because he could not take driving with the pain any longer. (R. 296.) He said that he had been treated for bipolar disorder since 2004. (*Id.*) Claimant was not in counseling, but he explained that he was receiving medication from the VA Hospital. (R. 297.) Drs. Halazon and Cappone noted that Claimant could follow one and two part directives, had trouble with complex directives, may not fully understand some directives, and was not likely to voice any difficulties. (R. 303.) The psychologists further opined that Claimant's pain would "contribute to his difficulty with physical aspects on a job as well as further impacting cognitive efficiency." (*Id.*) Claimant also had "a likelihood of misinterpreting situations and expressing anger on the job." (*Id.*)

Drs. Halazon and Cappone documented the following diagnoses: Axis I: cognitive disorder NOS, mood disorder NOS, alcohol dependence in sustained, full remission; Axis II: personality disorder NOS rigid functioning, paranoid thoughts, avoidant; Axis III: chronic pain, degenerative disc disease, bulging discs, arthritis, history of head injury; Axis IV: other psychological and environmental problems: avoidant, low social support; Axis V: GAF: 50. (*Id.*) Claimant's prognosis was "guarded[.]" (*Id.*)

Robert Newhouse, M.D., completed a mental RFC assessment on July 24, 2012. (R. 92-94.) After examining Claimant's medical records, Dr. Newhouse concluded that Claimant suffered from: cognitive disorder NOS; mood disorder NOS; and personality disorder NOS with some limitations in memory, concentration, pace and social interaction. (*Id.*) Dr. Newhouse also opined that Claimant: was able to follow one and two part directives; had a likelihood of misinterpreting situations; and had a likelihood of

expressing anger on the job. (*Id.*) Dr. Newhouse acknowledged that Claimant's extensive work history showed that he had some control over his trouble accepting direction. (*Id.*)

In his evaluation, Dr. Newhouse listed several areas in which Claimant demonstrated moderate limitations, including the ability to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and accept instructions and respond appropriately to criticism from supervisors. (R. 93-94.)

### C. Claimant's Testimony

On August 15, 2013, Claimant testified at an administrative hearing in front of ALJ Patrick Morrison. (R.32.) Claimant was born on May 11, 1957, making him 56 years old at the time of the hearing. (R. 150.) Claimant has a twelfth-grade education and served in the Army from 1975 until 1977. (R. 39.) Claimant worked as an over-the-road truck driver for over thirty years until March 26, 2012. (R. 41-43, 189.) Claimant is divorced with one daughter, and he lives by himself. (R. 38.)

With respect to his physical impairments, Claimant testified that his most significant problem is his fear of his discs acting up again and causing excruciating pain. (R. 44.) Claimant explained that he experiences bouts of severe disc pain as well as

pain and limited range of motion in his left shoulder.  (*Id.*)  He stated that the pain is "pretty constant" but that Vicodin "keeps it down at a lower level."  (R. 45.)  Claimant attested that, when taking the Vicodin, his constant pain level, on average, is two- to-three out of ten.  (R. 46.)  He further stated that his pain could reach upward of six- to-seven out of ten "two or three times a week."  (R. 46-47.)  If he was not on medication, a bad spike in the pain could result in an eight or nine out of ten.  (R. 48.)  Claimant utilizes a TENS[5] unit that "takes the pain away," but he did not have to use the unit for the past month.  (R. 48-49.)  Claimant also testified that he received steroid injections that relieved pain for durations ranging from ninety days up to "two to three years."  (R. 50.)

With respect to his mental disabilities, Claimant said that he saw a psychiatrist, but now just takes the anti-depressant Trazodone, which also helps with sleep issues. (R. 54.)  Claimant asserted that his short-term memory had deteriorated over the last several years and that he experienced difficulty in following directions when driving.  (R. 55.)  He further stated that he experienced anger problems in the past but that, with treatment from the VA, he has not experienced those problems in a few years.  (R. 56.) He also acknowledged that he might be anxious and standoffish around new people. (R. 57-58.)  Additionally, Claimant testified that he can follow one- to-three-step instructions and that his decision making capacity is okay.  (R. 58-59.)

Claimant testified that he still has his driver's license and drives to the store once or twice a week.  (R. 39.)  He goes to church regularly and drives himself.  (R. 64.)  He also babysits and plays video games with his grandson.  (R. 72.)  Claimant testified that

---

[5] TENS (Transcutaneous Electrical Nerve Stimulation) are predominately used for nerve related pain conditions and chronic conditions.  *See* http://www.tensunits.com (last visited April 20, 2017).

his pain limited his lifestyle in that he no longer goes fishing and only mows the grass if he cannot find someone to do it for him.  (R. 52.)  To relieve pain during the day, Claimant lays down for approximately two hours after lunch.  (R. 53.)  Claimant acknowledged that he cares for himself, is able to prepare mostly microwavable meals, and cleans his house.  (R. 60-62.)

### D. Vocational Expert's Testimony

At the hearing, Vocational Expert David Oswald described Claimant's prior work experience as being semi-skilled and medium in relation to strength.  (R. 78.)  The ALJ asked whether Claimant's past job could be performed by a hypothetical person with the same age, education, and work experience as Claimant, who is capable of performing work at the medium exertional level with the following restrictions: he can never work on ladders, ropes, scaffolding at unprotected heights or around dangerous moving machinery; he cannot perform work which requires crouching or crawling; he can occasionally climb stairs and ramps, stoop and kneel; and mentally he is limited to simple routine repetitive tasks requiring simple decisions.  (R. 79.)

The VE responded that Claimant's past work would be precluded, but that such a person could perform "medium classification" work of laundry workers, machine feeders, and assemblers.  (R. 79-80.)  The ALJ posed another question to the VE with an additional restriction that the hypothetical individual also be limited to being off task in the work place for "10 to 15 percent of the day" due primarily to pain.  (R. 80-81.)  The VE responded that the hypothetical individual would be precluded from Claimant's original occupation and any of the occupations listed in the first hypothetical.  (R. 81.)  The ALJ next inquired if Claimant's past work contained any skills that would be

transferrable with "little, if any, vocational adjustment" to a lower tier (SVP 3) position, and the VE responded "no." (*Id.*)  The ALJ posed one additional hypothetical that included the limitations from the first scenario with the added restriction that the individual would be absent from work two- to-three days a month, "month in, month out." (*Id.*)  The VE responded that such an individual would be precluded from all competitive work.  (*Id.*)

## II.    LEGAL ANALYSIS

### A. Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002).  Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales,* 402 U.S. 389, 401 (1971)).  We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner."  *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011).  "We conduct a critical review of the evidence, considering both the evidence that supports, as well as the evidence that detracts from, the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues."  *Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014) (quoting *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 351 (7th Cir. 2005) (internal quotations omitted)).

While the ALJ "must build an accurate and logical bridge from the evidence to

[his] conclusion," he need not discuss every piece of evidence in the record.  *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001).  At a minimum, the ALJ must "sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning."  *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir. 1985) (internal quotations omitted)).

### B. Analysis under the Social Security Act

In order to qualify for DIB, a claimant must be "disabled" under the Act.  A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy."  *Dixon,* 270 F.3d at 1176.  The claimant has the burden of establishing a disability at steps one through four.  *Zurawski v. Halter,* 245 F.3d 881, 885–86 (7th Cir. 2001).  If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy."  *Id.* at 886.

In this case, the ALJ applied this five-step analysis. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since his alleged onset date of March 27, 2012. (R. 16.) At step two, the ALJ concluded that Claimant suffered from the following severe impairments: degenerative disc disease in the cervical, thoracic, and lumbar spine; an affective disorder; personality disorder; cognitive disorder; and anxiety disorder. (*Id.*) Next, at step three, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 17.) The ALJ then determined that Claimant had the RFC to perform medium work as defined in 20 C.F.R. 404.1567(c), except with no more than occasional stooping, kneeling, or climbing of ramps and stairs, and no crouching, crawling, work on ladders, ropes or scaffolding, at unprotected heights, or around dangerous moving machinery. (R. 18.) Additionally, the ALJ found that Claimant was limited to simple, routine, and repetitive tasks requiring only simple work-related decisions and few changes in the work setting. (*Id.*)

Based on the RFC assessment, the ALJ concluded at step four that Claimant was unable to perform any past relevant work. (R. 22.) Lastly, at step five, the ALJ found that given Claimant's age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that Claimant could perform, such as assembler, laundry worker, or machine feeder. (R. 23.) Therefore, the ALJ found that Claimant had not been under a disability from March 27, 2012, through the date of his decision. (*Id.*)

Claimant now argues that (1) the ALJ's step three determination was erroneous; (2) the ALJ's RFC determination was erroneous; (3) the ALJ's credibility determination

was patently wrong; and (4) the ALJ's step five determination was erroneous. (Mot. at 1.)

### 1. The ALJ's Step Three Analysis Does Not Require a Remand.

It is undisputed that the claimant bears the burden to show that his impairments meet or equal a listed impairment. *Ribaudo v. Barnhart,* 458 F.3d 580, 583 (7th Cir. 2006) (*citing Maggard v. Apfel,* 167 F.3d 376, 380 (7th Cir. 1999)). Claimant makes three primary challenges to the ALJ's step three conclusion. Claimant first argues that the ALJ committed reversible error by failing to provide a more robust rationale for his step three decision in order to build an accurate and logical bridge between his reasoning and conclusion. Claimant then briefly alleges that the ALJ failed to conduct an equivalency assessment of Claimant's physical condition. Further, Claimant argues that the ALJ failed to utilize the proper technique for assessing his mental illness. As addressed below, the arguments are unavailing.

### i. The ALJ's step three analysis was not perfunctory.

Step three requires the ALJ to determine if the claimant has an impairment that meets or medically equals the severity of one listed in 20 C.F.R. pt 404, subpt. P., app. 1. 20 C.F.R. § 404.1520. "[A]n ALJ should mention the specific listings he is considering and his failure to do so, if combined with a perfunctory analysis, may require a remand. *Ribaudo,* 458 F.3d at 583; *Barnett v. Barnhart,* 381 F.3d 664, 668 (7th Cir.2004) (internal quotations omitted).

Here, the ALJ clearly stated the specific listing he considered, articulated the conditions required under listing 1.04, and explained that he found no evidence of the conditions. (R. 17.) Specifically, the ALJ found "no evidence of nerve root

compression, spinal arachnoiditis, or stenosis resulting in pseudoclaudication." (*Id.*)
Further, the ALJ discussed Claimant's severe and non-severe impairments, the
objective medical evidence, and his credibility when he determined Claimant's RFC. (R.
at 18-21.) The ALJ's discussion at step three, when considered in combination with his
discussion of Claimant's RFC, sufficiently met his "duty to articulate." *Curvin v. Colvin*,
778 F.3d 645, 650 (7th Cir. 2015); *see also Summers v. Colvin*, 634 Fed.Appx. 590, 593
(7th Cir. 2016).

With respect to his contention that the ALJ failed to notice evidence in the
medical records of the listed condition arachnoiditis, Claimant's line of reasoning is
flawed. Claimant argues that the ALJ ignored a medical note dated January 23, 2012
that indicated the possibility of spinal arachnoiditis. (Mot. at 5.) Claimant further
maintains that the record contains complaints of a "burning severe pain" that is
symptomatic of arachnoiditis. (*Id.*) However, the six instances Claimant cites
purporting to show documented instances of "burning severe pain" do not contain any
references to pain being "burning" as is claimed.

There is no indication in the record to establish that the ALJ rejected any
evidence that Claimant possessed a listed or medically equivalent disability. The ALJ
gave "great weight" to the opinion of Dr. VanderHaagen and concurred with his opinion
that Claimant did not possess a listed or medically equivalent disability. (R. 21.)
Further, there is no evidence in the record to establish that either the ALJ or Dr.
VanderHaagen failed to consider the medical note when they concluded that Claimant's
impairments did not meet or equal Listing 1.04. Claimant has offered no medical source
opinions or evidence that contradicts Dr. VanderHaagen's conclusions and the ALJ's

rationale.  Consequently, Claimant's argument is unpersuasive.

**ii. The ALJ did not fail to conduct an equivalency assessment of Claimant's physical condition.**

Claimant argues that the ALJ failed to conduct an equivalency assessment of Claimant's physical condition to determine if he possessed a condition that was medically equivalent to Listing 1.02(B) based on Claimant's cervical and thoracic disc degeneration.  (Mot. at 6.)  A Disability Determination and Transmittal form presents sufficient and substantial evidence to support an ALJ's step three determination because the form "conclusively establishes that consideration by a physician . . . . designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review."  *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (citing *Farrell v. Sullivan,* 878 F.2d 985, 990 (7th Cir. 1989)); 61 Fed.Reg. 34466.  An ALJ "may rely solely on opinions given in Disability Determination and Transmittal forms and provide little additional explanation only so long as there is no contradictory evidence in the record."  *Ribaudo*, 458 F.3d at 584.

Here, Dr. VanderHaagen completed and signed a Disability Determination and Transmittal form, which establishes that he considered the question of medical equivalence.  The ALJ gave great weight to Dr. VanderHaagen's opinion.  Further, the ALJ noted Claimant's reports that the pain was only mild.  Because the record is lacking in contradictory evidence, Dr. VanderHaagen's signed Disability Determination and Transmittal form is sufficient to satisfy the ALJ's equivalency analysis.

**iii. The ALJ properly assessed Claimant's mental illness.**

Claimant makes several arguments with respect to the ALJ's determination of his mental impairments.  The ALJ determined at step three that Claimant did not have an

impairment or combination of impairments that met or medically equaled the severity of any of the listings enumerated in the regulations. (R. 17); *see* 20 C.F.R. pt. 404, subpt. P., app. 1. Claimant contends that the ALJ's step three analysis was erroneous because the ALJ did not utilize the special technique used for assessing mental illnesses as required by 20 C.F.R. § 404.1520a. (Mot. at 6.) Claimant alleges that the ALJ did not document medical signs or laboratory findings that substantiate the presence of a mental disorder in accordance with the "A" criteria of the listings set out in 20 C.F.R. § 404.1520a(e)(4), and instead only focused on the "B" criteria of the listings. (*Id.*) While Claimant does not make clear which listing under the "A" criteria he believes he meets, an impairment must satisfy both the "A" and "B" criteria, or both the "A" and "C" criteria, to meet a mental listing. *See* 20 C.F.R., pt. 404, subpt. P, app.1, § 12.00 et. seq.

In this instance, the ALJ's step three analysis concluded that Claimant failed to satisfy the "B" criteria because his mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation. (R. 17.) To satisfy the "B" criteria, the claimant must demonstrate that the impairment resulted in a least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(B). A marked limitation means more than moderate, but less than extreme. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00. The ALJ also concluded, and

Claimant offered no contradictory evidence, that Claimant did not satisfy any of the "C" criteria. (R. 18.)

Claimant would not have qualified for these listings regardless of his satisfaction of the "A" criteria. Therefore, the ALJ's failure to discuss the "A" criteria was not error. If the ALJ properly determines that a claimant's impairments do not satisfy the "B" or "C" criteria of any mental impairment listing, then the ALJ has not committed error in not discussing the "A" criteria. *Lattarulo v. Colvin,* No. 13-CV-6714, 2015 WL 4100410, at *5 (N.D. Ill. 2015); *Smith v. Colvin*, 931 F. Supp. 2d 890, 900 (N.D. Ill. 2013); *Flynn v. Astrue*, F.Supp. 2d 932, 941 (N.D. Ill. 2008).

For his second argument, Claimant asserts that the ALJ disregarded medical diagnoses including psychological stressors, cognitive disorders, and rigid functioning. (Mot. at 9.) Claimant, however, misrepresents the record. For instance, Claimant cites a psychological progress report written by Dr. Wallman from October 25, 2012 as an example of the ALJ discounting that Claimant had "social stressors." (Mot. at 9.) In her report, Dr. Wallman noted that Claimant presented with problems with insomnia. (R. 410.) While Dr. Wallman did mention that Claimant has social stressors, she also noted that Claimant "has not been bipolar in s/s for three years off medication, worked and did well," and "does not meet criteria." (*Id.*) Though it is true that "social stressors" was mentioned, it was neither the reason for the visit or of any material significance to that visit.

Similarly, Claimant's contention that the ALJ erred in determining that Claimant's impairment of concentration, persistence or pace was no more than "moderate" because it disregarded evidence that he had "significant problems with well-learned

22

tasks in a job that led to his firing" is unavailing. (Mot. at 10.) The "significant problem" was not a diagnosis by a medical expert but rather self-reported by Claimant and recorded by Drs. Halazon and Cappone. (R. 303.) The ALJ must consider the entire record, including all relevant medical and nonmedical evidence, such as the claimant's own testimony. *See* 20 C.F.R. § 404.1545(a); 20 C.F.R. § 416.945(a). Here, the ALJ did not ignore evidence as Claimant maintains, but instead partially credited some of Drs. Halazon and Cappone's opinions in light of Claimant's own testimony and in consideration of the record as a whole. (R. 22); *See* 20 C.F.R. § 404.1527(d)(1); *Simila v. Astrue*, 573 F.3d 503, 515 (7th Cir. 2009).

Moreover, while the ALJ did not fully credit the agency psychological professionals in every aspect of their findings, the ALJ's ultimate conclusion was not in contrast to theirs. Both the ALJ and Dr. Newhouse ultimately concluded that Claimant's mental impairments did not meet or equal a listing. (R. 22, 89.) Accordingly, this Court does not find that the ALJ's conclusion in this respect was in error.

**2. The ALJ's RFC Determination was not Erroneous.**

Claimant asserts that the ALJ's RFC determination was erroneous because the ALJ "did not undertake a functional analysis of the combination of [Claimant's] physical and mental impairments." (Motion at 11.) In assessing a claimant's RFC, which is "the maximum that a claimant can still do despite his mental and physical limitations," the ALJ must consider the medical evidence in the record and all other relevant evidence, including the claimant's testimony regarding his impairments. *Craft v. Astrue,* 539 F.3d 668, 675–76 (7th Cir. 2008). "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts

(e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Social Security Ruling ("SSR"), 96–8p, 1996 WL 374184, at 7.

Here, the ALJ properly considered the medical evidence, Claimant's testimony, and the opinions of various physicians before reaching his RFC determination. In evaluating Claimant's testimony regarding his symptoms, the ALJ reviewed a number of factors, such as his daily activities, the nature of his pain, and his treatment regimen. (R. 19.) The ALJ also explained the weight he afforded each medical opinion and provided sufficient reasoning for the opinions he discounted. For example, the ALJ discounted a portion of Dr. Newhouse's opinion regarding Claimant's social limitations in light of Claimant's testimony that his anger problems have resolved with medication and social support. (R. 22.)

Claimant avers that the ALJ improperly interpreted terms from the diagnostic imaging. (Mot. at 11.) By doing so, Claimant argues, the ALJ erred because, as a layman, he cannot assume to know a proper medical professional's interpretation of the data. Had the ALJ relied solely on his own interpretations of Claimant's medical records, Claimant's argument would be persuasive. However, that is not the case. Here, the ALJ relied on the assessment of Dr. VanderHaagen, a trained and qualified medical expert. Furthermore, Dr. VanderHaagen's opinions were not contradicted by any other medical source. The ALJ also cited to instances in which treating physicians commented upon the mild to moderate nature of Claimant's injuries. (R. 20.) Accordingly, the ALJ's RFC determination was supported by substantial evidence and free from error. *See Filus v. Astrue,* 694 F.3d 863, 867 (7th Cir.2012) (ALJ did not err in relying upon uncontradicted opinions from reviewing physicians); *Summers v. Colvin,*

634 F. App'x 590, 593 (7th Cir.); *Trammell v. Colvin*, No. 12 CV 6780, 2014 WL 1227565, at *7 (N.D. Ill. Mar. 25, 2014)("Thus where, as here, the ALJ reviews the entire record and expressly relies on the uncontradicted opinions of state-agency consultants, that decision is supported by substantial evidence.")

### 3. The ALJ's Credibility Determination was not Patently Wrong.

Claimant next argues that the ALJ's credibility determination was patently wrong because the ALJ's explanation was inarticulate and vague. Specifically, Claimant asserts that the ALJ improperly stated that Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (Mot. at 13.) It is Claimant's position that the ALJ relies on the statement "reasons explained in this decision" without providing clear examples. Claimant himself, however, fails to discuss any inconsistencies and details which he believes the ALJ improperly considered.

Since the ALJ issued his decision in this case, the SSA has issued new guidance on how the agency assesses the effects of a claimant's alleged symptoms. SSR 96-7p and its focus on "credibility" has been superseded by SSR 16-3p in order to "clarify that subjective symptom evaluation is not an examination of the individual's character." *See* SSR 16-3p, 2016 WL 1119029, at *1 (effective March 16, 2016). As SSR 16-3p is simply a clarification of the Administration's interpretation of the existing law, rather than a change to it, it can be applied to Claimant's case. *See Qualls v. Colvin*, No. 14 CV 2526, 2016 WL 1392320, at *6 (N.D. Ill. Apr. 8, 2016); *Hagberg v. Colvin*, No. 14 CV 887, 2016 WL 1660493, at *6 (N.D. Ill. Apr. 27, 2016). While the Court will rely on the new guidelines under SSR 16-3, the Court is also bound by case law concerning former

SSR 96-7p. *Farrar v.* Colvin, No. 14 CV 6319, 2016 WL 3538827, at *5 (N.D. Ill. June 29, 2016).

Under SSR 16-3, the ALJ must first determine whether the Claimant has a medically determinable impairment that could reasonably be expected to produce his symptoms. SSR 16-3p, 2016 WL 1119029, at *2. Then, the ALJ must evaluate the "intensity, persistence and functionally limiting effects of the individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities." *Id.* An individual's statements about the intensity and persistence of the pain may not be disregarded because they are not substantiated by objective medical evidence. *Id.* at *5. In determining the ability of the Claimant to perform work-related activities, the ALJ must consider the entire case record, and the decision must contain specific reasons for the finding. *Id.* at *4, 9.

The ALJ is obligated to consider all relevant medical evidence and may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding. *Goble v. Astrue*, 385 Fed.Appx. 588, 593 (7th Cir. 2010). However, the ALJ need not mention every piece of evidence so long as he builds a logical bridge from the evidence to his conclusion. *Id.*

Contrary to Claimant's position, the ALJ sufficiently articulated his credibility determinations and addressed the relevant factors that contributed to those decisions. (R. 19-22.) The ALJ noted specific diagnostic results and medical expert opinions, addressed the weight given to each opinion, and adjusted Claimant's RFC accordingly. (*Id.*) For instance, noting Claimant's spinal impairments and his utilization of narcotic pain medication, the ALJ limited Claimant to medium work with a host of limitations. (R.

19.)  Also, the ALJ credited Claimant's own testimony and medical records when he stated that his physical impairments were generally mild with treatment, and his mental impairments had resolved with medication.  (R. 20.)  In regard to his mental health analysis, the ALJ stated:

> [D]ue to the claimant's performance during objective mental status examination, his own assertions that his symptoms are controlled with medication, his ability to work at the substantial gainful activity level for a number of years despite his mental health impairments, and his own admission that he can follow one to three step instructions, the undersigned finds he can perform simple, routine, and repetitive tasks requiring only simple work-related decisions and few changes in the work setting.
> (R. 21.)

As the Seventh Circuit has regularly held, "[r]eviewing courts … should rarely disturb an ALJ's credibility determination, unless that finding is unreasonable or unsupported."  *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).  Here, the ALJ sufficiently articulated "the reasons explained in [his] decision" and supported his credibility determination.  Consequently, Claimant's argument that the ALJ's credibility determination was patently wrong fails.

### 4. The ALJ Properly Utilized the VE's Testimony at Step Five.

Claimant's final argument is that the ALJ erred by not informing the VE of Claimant's impairment-related symptoms before posing hypotheticals to the VE.   (Mot. at 14.)   For example, Claimant takes issue with the ALJ seemingly discounting Claimant's psychological impairment that he "could follow one and two part directives, but may not understand some directives and is not likely to voice any difficulty."  (*Id.*)

An ALJ "must question the vocational expert regarding every impairment set forth in the claimant's record to the extent that the impairment is supported by the medical

evidence." *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003); *see also Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009). However, "the ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible." *Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir. 2007)

During Claimant's administrative hearing, the ALJ posed a hypothetical wherein the hypothetical individual was limited physically to medium exertional tasks and mentally to simple routine repetitive tasks requiring simple decisions. (R. 79.) We cannot find the equating of "routine repetitive tasks requiring simple directions" with "one and two part directives, but may not understand some directives and is not likely to voice any difficulty" to be so disparate as to require remand on this issue. Based on his RFC analysis, the ALJ sufficiently incorporated impairments that he found credible into his hypothetical questions posed to the VE.

As the ALJ noted in his determination of Claimant's RFC, Claimant admitted that he could follow one- to-three-step instructions, he admitted that his temper and anger problems had resolved with medication, and had "unremarkable objective mental status examination findings" at a recent examination. (R. 22.) The ALJ partially credited Dr. Newhouse's opinion of Claimant's mental health impairments in light of Claimant's own testimony and the record as a whole. In doing so, the ALJ formulated a mental RFC that differed from Dr. Newhouse's opinion but was logically supported by the record. Therefore, the ALJ satisfactorily incorporated into his hypothetical all mental limitations that he found credible.

### III. Conclusion

For the reasons set forth above, the Commissioner's motion for summary judgment is granted and the Claimant's motion for summary judgment is denied.

**ENTERED:**

_____
**Michael T. Mason**
**United States Magistrate Judge**

**Dated: April 25, 2017**